

CLERK, U.S. BANKRUPTCY COURT
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 17, 2020**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 17-42482-ELM-7 |
| STEPHEN C. JENKINS, | § | |
| | § | Chapter 7 |
| Debtor. | § | |
| | § | |
| AREYA HOLDER AURZADA, | § | |
| CHAPTER 7 TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 17-04155 |
| | § | |
| MORGAN ELIZABETH JENKINS and | § | |
| TYLER JOSEPH JENKINS, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

The above-captioned adversary proceeding came on for trial before the Court on February 11, 2019. In the action, Areya Holder Aurzada (the "**Trustee**"), the chapter 7 trustee of the bankruptcy estate of Stephen C. Jenkins (the "**Debtor**"), the chapter 7 debtor in Case No. 17-42482 (the "**Bankruptcy Case**"), asserts that the Debtor made certain transfers of property to or for the benefit of his adult children, Defendants Morgan Elizabeth Jenkins ("**Morgan**") and Tyler Joseph

Jenkins ("**Tyler**" and together with Morgan, the "**Jenkins Children**"), that are avoidable and recoverable as constructively fraudulent under sections 548 and 550 of the Bankruptcy Code.[1]  The Trustee additionally asserts that the transfers are avoidable as both constructively and intentionally fraudulent under sections 24.005 and 24.006 of the Texas Uniform Fraudulent Transfer Act ("**TUFTA**").[2]  The transfers at issue are (1) an alleged $82,266.00 "gift of equity" (the "**Gift of Equity**") made by the Debtor to the Jenkins Children in connection with the Debtor's sale of real property located at 1709 Tremont Avenue in Fort Worth, Texas (the "**Tremont Property**") to them, (2) $14,644.00 in cash payments allegedly made by the Debtor to cover closing costs in connection with the sale (the "**Cash Transfer**"), and (3) $24,608.08 in prepetition mortgage payments allegedly made by the Debtor on behalf of the Jenkins Children after the sale had closed (collectively, the "**Mortgage Transfers**" and together with the Gift of Equity and the Cash Transfer, the "**Transfers**").[3]  The Trustee additionally claims that the bankruptcy estate holds an equitable interest in the Tremont Property on account of the Transfers and requests the partition and sale of the Tremont Property pursuant to section 23.001 of the Texas Property Code to recover the value of the Transfers.[4]  Finally, the Trustee requests an award of attorneys' fees and expenses, along with pre- and post-judgment interest and court costs.[5]

The Jenkins Children timely filed their answer in opposition to the Trustee's Complaint.[6]  The Jenkins Children assert, among other things, that at the time of the sale, the Tremont Property was owned by the Debtor and Elizabeth Jenkins ("**Elizabeth**" and together with the Debtor, the

---

[1] *See* 11 U.S.C. §§ 548(a)(1)(B) and 550(a).

[2] *See* Tex. Bus. & Com. Code §§ 24.005(a) and 24.006(a).

[3] *See* Docket No. 1 (Trustee's Original Complaint, or "**Complaint**" for short), at pp. 4-6.

[4] *See id.*, at pp. 6-7; *see also* Docket No. 57 (Corrected Joint Pretrial Order, or "**PTO**" for short), at pp. 2-4.

[5] *See* Complaint, at p. 7 (prayer for relief).

[6] *See* Docket No. 7 ("**Answer**").

"**Jenkinses**"), his wife of roughly twenty-six years, as community property protected by the Texas homestead exemption laws and that, as a result of the homestead exemption, the Gift of Equity is unavoidable.[7] The Jenkins Children alternatively take issue with the extent and amount of the Transfers alleged by the Trustee and dispute that the Debtor did not receive reasonably equivalent value in exchange for the Transfers. Finally, the Jenkins Children assert this Court does not have jurisdiction to handle the Trustee's partition claim under the Texas Property Code because a partition claim may only be brought in the Texas state district located within the county where the property is located.[8]

Having considered the Trustee's Complaint, the Jenkins Children's Answer, the parties' respective pretrial submissions,[9] the evidence introduced at trial, and the arguments of counsel, the Court now issues its findings and conclusions pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[10]

### *JURISDICTION*

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc (Miscellaneous Rule No. 33)* of the United States District Court for the Northern District of Texas. Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The proceeding is both core and non-core in nature. The Trustee's claims under sections 548 and 550 of the Bankruptcy Code constitute core matters pursuant to 28 U.S.C. § 157(b)(2)(H), inasmuch

---

[7] *See* PTO, at pp. 4-6.

[8] *See id.*, at p. 6.

[9] *See* Docket Nos. 44-47 and 57.

[10] To the extent any of the following findings of fact are more appropriately categories as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categories as findings of fact or include findings of fact, they should be deemed as such.

they arise under the Bankruptcy Code.[11] The Trustee's claims under TUFTA[12] and the Texas Property Code, on the other hand, constitute non-core matters, inasmuch as neither of them arise under the Bankruptcy Code or in the Bankruptcy Case, but they are related to the Bankruptcy Case.[13] All of the parties have consented to the Court's entry of a final judgment in this case.[14] Therefore, the Court has both the statutory[15] and Constitutional[16] authority to do so.

## FACTUAL BACKGROUND

### A. The Debtor's House Remodeling Business and Acquisition of the Tremont Property

For roughly 24 years prior to his bankruptcy filing, between 1992 and 2016, the Debtor worked as a self-employed contractor within the house construction and remodeling industry. He operated under the names Steve Jenkins Construction Co., Steve Jenkins Remodeling, and 3 Point Construction LLC.[17]

During the latter part of this time frame, the Debtor, along with Robert Bond ("**Bond**"), his uncle, and Chris Hill ("**Hill**"), a close friend of Bond, worked together on several "house flipping" projects, whereby the Debtor would locate a distressed property to acquire, Bond and/or Hill would provide the financing for the Debtor's acquisition and remodeling of the property, and then the Debtor would resell the property, with the financing provided by Bond and/or Hill to be repaid out

---

[11] *See* 28 U.S.C. § 157(b)(1) (referring to "core proceedings arising under title 11, or arising in a case under title 11").

[12] As discussed further herein, the Trustee has not coupled her TUFTA claims with a claim under section 544(b)(1) of the Bankruptcy Code. *See* 11 U.S.C. § 544(b)(1) (granting the trustee the power to avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under the Bankruptcy Code). Had she done so, then arguably the TUFTA claims, as part of her Bankruptcy Code § 544(b)(1) claim, would have been brought under the core proceeding umbrella of 28 U.S.C. § 157(b)(2)(H).

[13] *See* 28 U.S.C. § 157(b)(1), (c).

[14] *See* PTO, at p. 11 (Agreed Issues of Law, ¶ 1).

[15] *See* 28 U.S.C. § 157(b)(1), (c)(2).

[16] *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1942-48 (2015).

[17] *See* Trustee's Exh. 5 (Statement of Financial Affairs Part 11, Question 27).

of the sales proceeds and any remaining profit (if any) to be pocketed by the Debtor. The Tremont Property was the last of these "house flipping" projects.

On March 30, 2015, the Debtor purchased the Tremont Property with a $325,000 loan provided by Hill (the "**Hill Loan**"). The deed to the property was taken in the Debtor's name alone.[18] Inasmuch as the promissory note executed by the Debtor to Hill neither provided for periodic principal and interest payments nor a maturity date, it was effectively a demand note.[19] The note was secured by a deed of trust lien on the Tremont Property.[20]

## B.     *The Debtor Shuffles His Property Ownership as His Business Struggles*

By the time of the Tremont Property acquisition, serious cracks were developing in the foundation of the Debtor's remodeling business. For example, by the Spring of 2015, not only did the Debtor lack funding to complete the remodeling project that he had underway at the home of Kelly and Carla Little, but he was also unable to pay for the work that his subcontractors had already performed on the house. Consequently, despite the Debtor's long-time relationship with Mr. Little, the Debtor terminated all work on the project in May 2015.[21]

As matters continued to deteriorate, the Jenkinses decided to sell their existing residence at 6299 Bennett Lawson Road, Mansfield, Texas 76063 (the "**Bennett Lawson Property**"). On October 15, 2015, the sale closed and the Jenkinses moved out.[22] While the Debtor had previously committed to repay $100,000 of the Hill Loan out of the Bennett Lawson Property sales proceeds, by the time of the closing the Debtor could only afford to commit $50,000 of the sales proceeds

---

[18] *See* Trustee's Exh. 20(a), at p. 2 (Allegiance title report).

[19] *See* Trustee's Exh. 7, at p. 9 (Hill note).

[20] Trustee's Exh. 7 (Deed of Trust relating to Hill Loan); PTO, ¶ II.9.

[21] *See* PTO, ¶ II.21. At trial, the Debtor provided testimony in conflict with these stipulated facts from the joint pretrial order. Inasmuch as counsel for the Jenkins Children in this adversary proceeding is also counsel for the Debtor in the Bankruptcy Case, the Court does not find the Debtor's conflicting testimony to be credible.

[22] *See* PTO, ¶ II.10; Trustee's Exh. 6 (final settlement statement with respect to sale of Bennett Lawson Property).

due to the extent of his financial troubles. Hill accepted the lesser amount but required the Debtor to promptly refinance the balance.

With the assistance of a loan broker, the Debtor thereafter found a new lender in Chris Dance ("**Dance**"). With the understanding that the Tremont Property was one of the Debtor's "house flipping" projects, Dance agreed to a $295,000 short-term loan (the "**Dance Loan**") to enable the Debtor to pay off the Hill Loan, complete the renovations, and then resell the property, with the Dance Loan to be paid off out of the sales proceeds.

On November 20, 2015, the Debtor closed on the Dance Loan. The Dance Loan was evidenced by a promissory note (the "**Dance Note**") secured by a deed of trust lien on the Tremont Property.[23] Under the terms of the Dance Note, the Debtor was obligated to make monthly interest payments until the note's maturity on December 1, 2016, at which time all unpaid principal and interest would be due in a single balloon payment.[24]

In connection with obtaining the Dance Loan, the Jenkinses executed documentation to confirm that the Tremont Property was the separate, non-homestead, commercial property of the Debtor. First, the Debtor executed an Affidavit and Designation of Commercial Purpose to affirm (a) that neither he nor Elizabeth resided at the property, and that neither of them would occupy the property as long as the Dance Loan was unpaid, (b) that no part of the property constituted exempt property, and (c) that the proceeds of the loan would be used exclusively for business/commercial purposes and not for any personal, household or family use.[25] Second, Elizabeth executed an Agreement and Joinder of Spouse to, among other things, confirm that the Tremont Property "shall

---

[23] *See* PTO, ¶¶ II.11 and 13.

[24] *See id.*, ¶ II.14; Trustee's Exh. 9 (Dance Note).

[25] *See* Trustee's Exh. 16 (Affidavit and Designation of Commercial Purpose).

be deemed to be or to have remained the sole and separate property of [the Debtor]."[26] Finally, despite the Jenkinses' sale of the Bennett Lawson Property over a month earlier and their immediate move out of the property upon closing, the Debtor and Elizabeth each executed a Homestead Designation Affidavit to confirm their designation of the Bennett Lawson Property as their homestead and to renounce and disclaim any homestead claim to the Tremont Property.[27]

### C. The Jenkinses Move Into the Tremont Property In Contravention of the Dance Loan Representations

In December 2015, following the closing of the Dance Loan and the completion of renovations to the Tremont Property, the Jenkinses moved into the Tremont Property in contravention of the representations that they had made to Dance. According to the Debtor, he came to view the Tremont Property as the new Jenkins family residence and homestead only after the Dance Loan had closed.

Elizabeth, on the other hand, testified that, before the Dance Loan closed, the Jenkinses had planned to move into the Tremont Property. In fact, she bluntly admitted that the Jenkinses misrepresented their intentions to Dance so that they could save the Tremont Property as their home. Further evidencing their intent to move into the property upon sale of the Bennett Lawson Property is the fact that, during the roughly five- to six-week period following their sale of the Bennett Lawson Property and the completion of renovations to the Tremont Property, the Jenkinses lived in a hotel as opposed to an apartment, house or other rental property.

---

[26] *See* Trustee's Exh. 14, ¶ 2 (Agreement and Joinder of Spouse).

[27] *See* Trustee Exh. 15 (Homestead Designation Affidavits).

**D.**    ***The Debtor Defaults on the Dance Loan and Shuts Down His Business;***
***The Jenkinses Develop a New Strategy to Save the Tremont Property***

Throughout 2015, the Debtor continued to lose large amounts of money on his "house flipping" projects.  Ultimately, the Debtor failed to make the first two payments on the Dance Note, due in January and February of 2016.  Thus, Dance declared a default and provided written notice of his intent to foreclose on the Tremont Property.  While Dance ended up agreeing to hold off on the foreclosure due to catch-up payments that the Debtor cobbled together with funds from his mother, it would only be a matter of time before foreclosure would be back in the picture.

At or around this time in early 2016, the Debtor decided to completely shut down his home construction and remodeling business.  And with the loss of the Tremont Property looming, Elizabeth largely took over the family's finances and began to look for a new lender.

Contributing to the fact that their finances were in shambles, the Jenkinses had the additional problem of a prior foreclosure on their record.  Consequently, Elizabeth was unsuccessful in her search for a new lender.  Thus, with no other source of capital available, the Jenkinses resorted to the development of a new strategy.  Using their adult children, whose credit was untarnished, the plan was to refinance the Dance Loan by having their children purchase the Tremont Property with financing obtained in their own names.

Once identifying a potential lender in NTFN, Inc. ("**NTFN**"), the Debtor entered into a contract with the Jenkins Children for sale of the Tremont Property (the "**Property Sale Contract**").  The purchase price would be $346,786, $334,650 of which would be financed. Pursuant to the Property Sale Contract, an unspecified portion of the closing obligations would be

satisfied through a "gift of equity."[28]  The Property Sale Contract contemplated a closing by July 29, 2016.[29]

In connection with the NTFN loan application, an appraisal was obtained for the Tremont Property.  The appraisal, issued as of July 22, 2016, came back at $358,000.[30]  Thus, because of its proximity to the amount of the sales price to be financed, the Jenkins Children failed to obtain loan approval under NTFN's underwriting requirements.

At this point, it was clear that the sale would not close by the end of July 2016.  And this created an additional wrinkle, being that Tyler was slated for active military service outside of the country.  The Jenkinses solved the dilemma, however, by having Tyler execute a Statutory Durable Power of Attorney (the "**POA**") to appoint Elizabeth as his agent and attorney-in-fact for purposes of all real property transactions, including financing transactions, involving the Tremont Property.[31]

Thereafter, Elizabeth found a new potential lender in Quicken Loans ("**Quicken**").  To avoid the same type of loan underwriting problems encountered with NTFN, Elizabeth pinned down terms that would satisfy Quicken's requirements.  Using the new terms, Morgan and Tyler (via Elizabeth per the POA) agreed to an increase in the sales price to $375,989 (the "**Sales Price**") and a decrease in the amount to be financed to $300,791.  Correspondingly, the Debtor agreed to an increase in the amount of the "gift of equity" credit to be given to the Jenkins Children.

In preparation for the closing scheduled for September 19, 2016, Allegiance Title Company ("**Allegiance**") issued Closing Disclosures to the Jenkins Children and the Debtor.[32]  Each of

---

[28] *See* Trustee's Exh. 20(d) (Property Sale Contract), ¶¶ 3 and 11.

[29] *See id.*, ¶ 9.A.

[30] *See* Trustee's Exh. 19 (appraisal).

[31] *See* Trustee's Exh. 20(p) (POA).

[32] *See* Trustee's Exh. 20(i) (Closing Disclosures).

Morgan, Tyler (via Elizabeth under the POA) and the Debtor signed off on the Closing Disclosures as accurate on September 19, 2016.

With respect to the Jenkins Children's obligations and credits at closing, the Closing Disclosures reflected: (i) borrower obligations of $375,989 for the Sales Price plus $16,305.20 in closing costs, for a total of $392,294.20 due at closing; and (ii) borrower credits of $300,791 in Quicken loan funds, $82,266.00 for the Gift of Equity, and $6,727.75 in pro-rated ad valorem taxes through closing, for a total of $389,784.75; leaving a cash at closing balance due from the Jenkins Children of $2,509.45 (the "**Jenkins Children's Closing Cash Payment**").[33]

With respect to the Debtor's credits and obligations at closing, the Closing Disclosures reflected: (i) a seller credit of $375,989 for the Sales Price; and (ii) seller obligations of $298,436.58 to pay off of the Dance Note, $82,266.00 for the Gift of Equity, $6,727.75 for pro-rated ad valorem taxes, and $693.75 in additional closing costs, for a total of $388,124.08; leaving a cash at closing balance due from the Debtor of $12,135.08 (the "**Debtor's Closing Cash Payment**").[34]

## E.      *The Sale to the Jenkins Children Closes*

On September 19, 2016 (the "**Closing Date**"), the sale of the Tremont Property to the Jenkins Children closed.[35]  The Jenkinses[36] executed a general warranty deed to evidence transfer of title to the Jenkins Children (the "**Property Deed**")[37] and a title policy in the full amount of the Sales Price was issued to the Jenkins Children.[38]

---

[33] *See id*., at p. 3.

[34] *See id*., at p. 17.

[35] PTO, ¶ II.28.

[36] Because the Tremont Property was acquired during the marriage of the Debtor and Elizabeth, Allegiance understandably required both the Debtor and Elizabeth to execute the Property Deed.

[37] *See* Trustee's Exh. 20(g) (Property Deed).

[38] PTO, ¶ II.37.

As part of the closing, Morgan and Tyler (via Elizabeth under the POA) executed a promissory note in the original principal amount of $300,791 to Quicken (the "**Quicken Note**") and a deed of trust mortgage in favor of Quicken.[39]  The closing file of Allegiance reflects that the Jenkins Children's Closing Cash Payment was paid by a cashier's check obtained by the Debtor in the amount of $2,509.45,[40] and that the Debtor's Closing Cash Payment was paid by a cashier's check obtained by Elizabeth in the amount of $12,135.08.[41]  According to Elizabeth and Tyler, the Jenkins Children contributed $6,800.00 towards the Jenkins Children's Closing Cash Payment and the Debtor's Closing Cash Payment.  Finally, the Allegiance closing file also reflects that $82,266.00 of the Sales Price was satisfied by the Gift of Equity credit.[42]

Following the closing, while the Jenkinses neither retained any interest in the Tremont Property under the Property Deed nor executed a lease with the Jenkins Children, the Jenkinses continued to occupy the Tremont Property with the permission of the Jenkins Children and, in fact, made all of the ongoing mortgage payments.[43]  Through June 13, 2017 (the date of the Debtor's bankruptcy filing), the mortgage payments totaled at least $16,908.56.[44]

### F.    The Debtor's Financial Condition as of the Closing Date

Leading up to, and on, the Closing Date, the Debtor's financial condition was grim.  As of the Closing Date, the Debtor had only $1,176.05 remaining in his business accounts and had a negative cash balance in his personal checking account.[45]  As of the Closing Date, the Debtor was

---

[39] *See* Trustee's Exhs. 20(e) (Quicken Note) and 20(f) (deed of trust in favor of Quicken).

[40] *See* Trustee's Exh. 20(l) (copy cashier's check); PTO, ¶ II.35.

[41] *See* Trustee's Exh. 20(k) (copy of cashier's check); PTO, ¶ II.34.

[42] PTO, ¶ II.33.

[43] *See id.*, ¶ II.64.

[44] *See* Trustee's Exh. 20(e) (Quicken Note, providing for monthly payments of $2,113.57 beginning on November 1, 2016); PTO, ¶ II.33.

[45] *See* PTO, ¶¶ II.25-II.27.

in default under the Dance Note and believed that he would be unable to pay off the Dance Note on December 1, 2016, when the balloon payment would be due.[46]

In September 2016, the Debtor was also unable to pay, among other obligations, amounts that he owed to Larry Ford for construction work he had performed on two of the Debtor's projects.[47] And in September 2016, the Debtor had two lawsuits pending against him,[48] one of which would later result in a judgment for $17,486.72.[49]

Thus, as evidenced by the above, the Debtor was insolvent as of the Closing Date.[50]

## G. The Debtor's Concealment of the Sale and Gift of Equity

On June 13, 2017 (the "**Petition Date**"), the Debtor initiated the Bankruptcy Case with the filing of his voluntary petition for relief under chapter 7 of the Bankruptcy Code.

On June 27, 2017, the Debtor filed his sworn Statement of Financial Affairs ("**SOFA**").[51] Question 18 of the SOFA asked the following: "Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?" In response, the Debtor failed to disclose sale of the Tremont Property to the Jenkins Children.[52] Question 13 of the SOFA also asked the following: "Within 2 years before you filed for bankruptcy, did you give any gifts with a total

---

[46] See id., ¶ II.20.

[47] See id., ¶ II.22.

[48] See id., ¶¶ II.23, II.57 and II.58.

[49] See id., ¶¶ II.58 and II.60.

[50] See also id., at p. 5 (Jenkins Children's acknowledgment that they "do not dispute the allegation that Debtor was insolvent at the time the Tremont Property was sold them….").

[51] See Trustee's Exh. 3 (SOFA).

[52] See id., at p. 6 (SOFA Part 7, Question 18).

value of more than $600 per person?"   In response, the Debtor failed to disclose the Gift of Equity.[53]

On August 21, 2017, in advance of the continued meeting of creditors under section 341 of the Bankruptcy Code (the "**341 Meeting**"), the Debtor filed an amended sworn SOFA (the "**Amended SOFA**").[54]   While this time the Amended SOFA disclosed transfer of the Tremont Property to the Jenkins Children, the Debtor continued to fail to disclose the Gift of Equity.[55] Based upon the newly-disclosed transfer, however, the Trustee questioned the Debtor about the transfer at the continued 341 Meeting.   Among other things, the Debtor testified that the Tremont Property had a value of roughly $375,000 to $400,000.   Then in response to questions about the Debtor's acquisition of the property, the Debtor falsely testified under oath that he had purchased the Tremont Property in October 2015 with, among other funds, approximately $175,000 in cash from the sale of the Bennett Lawson Property.[56]

Not until three months later did the Debtor begin to remedy the false statements and omissions.   On October 23, 2017, the Debtor filed his second amended sworn SOFA (the "**Second Amended SOFA**").[57]   Therein, the Debtor disclosed for the first time the gift of equity to the Jenkins Children.   Instead of disclosing the amount of the Gift of Equity (*i.e.* $82,266.00), however, he deceptively described the gift as being in an "undetermined amount."[58]

On November 30, 2017, the Trustee initiated this adversary proceeding to pursue the avoidance and recovery of the Transfers.

---

[53] *See id.*, at p. 5 (SOFA Part 5, Question 13).

[54] *See* Trustee's Exh. 4 (Amended SOFA).

[55] *See id.*, at pp. 5 and 7 (Amended SOFA Part 5, Question 13, and Part 7, Question 18).

[56] PTO, ¶¶ II.50-II.51.

[57] *See* Trustee's Exh. 5 (Second Amended SOFA).

[58] *See id.*, at p. 5 (Second Amended SOFA Part 5, Question 13).

***DISCUSSION***

**A.     *Avoidance of Transfers Under 11 U.S.C. § 548***

The Trustee first asserts that the Transfers are avoidable as constructively fraudulent under section 548 of the Bankruptcy Code.  As applicable to the Trustee's Complaint, Section 548 provides in relevant part:

> The trustee may avoid any transfer … of an interest of the debtor in property … that was made … on or within 2 years before the date of the filing of the petition, if the debtor … (i) received less than a reasonably equivalent value in exchange for such transfer …; and (ii) … was insolvent on the date that such transfer was made….

11 U.S.C. § 548(a)(1)(B).  Thus, with respect to each of the Transfers, to establish a claim for avoidance under the above provisions of section 548, the Trustee must prove each the following elements by a preponderance of the evidence: (1) that the Transfer was of an interest of the Debtor in property; (2) that the Debtor made the Transfer on or within 2 years before the Petition Date; (3) that the Debtor received less than a reasonably equivalent value in exchange for the Transfer; and (4) that the Debtor was insolvent on the date that the Transfer was made.[59]

In this case, the Jenkins Children do not dispute that the Transfers were made within two years of the Petition Date or that the Debtor was insolvent on the date that the Transfers were made.  The Trustee has clearly satisfied these elements.  Instead, the Jenkins Children focus their attack on the extent or amount of the Debtor's interest in the Transfers at issue and whether the Debtor received less than a reasonably equivalent value in exchange for the Transfers.  Additionally, in the case of the Gift of Equity, the Jenkins Children also argue that the transfer is

---

[59] *See Gowan v. Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391, 436 (Bankr. S.D.N.Y. 2011) (explaining that the trustee, as the party seeking to avoid the transaction, bears the burden of proof by a preponderance of the evidence on all elements of a claim for constructive fraudulent transfer under § 548(a)(1)(B)).

immune from attack based upon the Tremont Property's alleged status as exempt homestead property.

## 1.    *Extent and Amount of the Debtor's Interest in Transfers*

The Jenkins Children first challenge the extent and amount of the Debtor's interest in each of the Transfers.

### *(a) Gift of Equity*

In the case of the Gift of Equity, the Jenkins Children present two arguments.  First, they claim that the Gift of Equity was not real and was nothing more than an agreed-upon[60] non-monetary, make believe increase to the price of the Tremont Property in order to meet Quicken's loan-to-value underwriting requirements.  Therefore, they argue that there is no property interest to be avoided, or at least no interest of any value.  The Trustee, on the other hand, asserts that the finalized terms of the transaction were memorialized in the Allegiance Closing Disclosures, all of which were approved as accurate by the Debtor and the Jenkins Children, and that the Debtor and Jenkins Children cannot now reverse course, after-the-fact, on account of the litigation.  The Court agrees with the Trustee.

In short, the Jenkins Children would apparently have the Court both recognize that they and the Debtor engaged in fraudulent conduct in obtaining the Quicken loan, in executing the Allegiance Closing Disclosures, and in obtaining the issuance of an inflated title policy, and then condone such conduct in disregarding the existence of the Gift of Equity.  The Court declines to do so.  Just as a party may not obtain an affirmative recovery in litigation where it is necessary for

---

[60] At one point during the trial the Debtor took a slightly different approach, testifying with respect to each of the material documents that he signed that because he did not read them, did not know what he was signing, and did not mean what he was signing, he should not be bound to their terms.  Not only did the Court find such testimony to be non-credible, but "courts have repeatedly held that 'a party is bound by the terms of the contract he signed, regardless of whether he read it or thought it had different terms.'" *Martinez v. Pilgrim's Pride Corp.*, Civil Action No. 3:16-CV-3043-D, 2017 WL 6372385, at *4 (N.D. Tex. Dec. 13, 2017) (citing *In re McKinney*, 167 S.W.3d 833, 835 (Tex. 2005) (citing *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 90 (Tex. 1996))).

such party to prove, as part of the party's cause of action, the party's own illegal conduct,[61] a party also may not obtain defensive relief where it is necessary for such party to prove, as part of the party's defense, the party's own illegal conduct. Here, the evidence is clear that the Debtor and the Jenkins Children agreed upon a sales price of $375,989 for the Tremont Property, $82,266.00 of which was satisfied through the Gift of Equity.

Next, predicated on the assertion that the Tremont Property constituted the community property of both the Debtor and Elizabeth, as opposed to the separate property of the Debtor, the Jenkins Children assert that the Trustee has improperly allocated the full amount of the Gift of Equity to the Debtor, whereas a portion of the gift should be allocated to Elizabeth. In response, the Trustee asserts that the Tremont Property was acquired by the Debtor as his separate, business property, and that Elizabeth acknowledged as much in executing the Agreement and Joinder of Spouse in connection with the Dance Loan. In certain respects, both parties miss the mark in their arguments.

First, both the Trustee and the Jenkins Children appear to treat the Gift of Equity as an interest in the Tremont Property, itself, in arguing about whether transfer of *the Tremont Property* should be avoided. But the Trustee has not sought to avoid transfer of the Tremont Property; she has sought to avoid *the Gift of Equity*. And the Gift of Equity was not an interest in the Tremont Property. It was the waiver or release of the contractual right to receive $82,266.00 of the $375,989 Sales Price for the Tremont Property.[62] Thus, the appropriate reframed question is whether the

---

[61] *See Rico v. Flores*, 481 F.3d 234, 241-42 (5th Cir. 2007).

[62] The fact that the Gift of Equity constituted a waiver or release of the contractual right to receive a portion of the Sales Price, as opposed to an interest in the Tremont Property itself, does not change the fact that the Gift of Equity was a transfer for purposes of section 548 of the Bankruptcy Code. "Courts have consistently held that a 'transfer' occurs when a debtor forgives indebtedness owed to it by a third party." *Arrowsmith v. Lemberg Law, LLC (In re Health Diagnostics Lab., Inc.)*, 571 B.R. 182, 196 (Bankr. E.D. Va. 2017); *see also Kirschner v. Blixseth*, CV 11-08283 GAF (SPx), 2012 WL 12885070, at *4 (C.D. Cal. 2012); *Endeavour GP, LLC v. Endeavour Highrise, LP (In re Endeavour Highrise, LP)*, 432 B.R. 583, 655 (Bankr. S.D. Tex. 2010); 11 U.S.C. § 101(54)(D) (defining "transfer"

contractual right to receive the Sales Price constituted the community property of the Debtor and Elizabeth. If so, then the secondary question becomes whether the entirety of that community property interest constituted "an interest of the debtor in property" for purposes of section 548 of the Bankruptcy Code, or whether some portion of the community property interest was solely allocable to Elizabeth such that the waiver/release provided by way of the Gift of Equity must be reduced, for avoidance purposes, by a proportionate amount.

The Bankruptcy Code does not define or otherwise delineate what constitutes "an interest of the debtor in property" for purposes of section 548. Given the import of avoidance provisions to creditor recoveries, however, the phrase is properly construed as referring to any interest of the debtor in property that would constitute property of the debtor's bankruptcy estate but for the debtor's transfer of such interest.[63] With that in mind, section 541 of the Bankruptcy Code details the extent of the bankruptcy estate. It provides that the estate is comprised of all legal and equitable interests of the debtor as of the commencement of the case, and in the case of community property, all interests of the debtor and the debtor's spouse in community property as of the commencement of the case that are, among other things, under the sole, equal or joint management and control of the debtor.[64]

In determining whether property constitutes community property, a court is guided by applicable state law.[65] In Texas, community property consists of all property, other than separate

---

as meaning, among other things, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property").

[63] See In re Merchants Grain, Inc., 93 F.3d 1347, (7th Cir. 1996) (quoting In re Bullion Res. of N. Am., 836 F.2d 1214, 1217 (9th Cir.), cert. denied, 486 U.S. 1056 (1988)), cert. denied sub nom. Mahern v. Adkins, 519 U.S. 1111 (1997); Health Diagnostics Lab., 571 B.R. at 195.

[64] See 11 U.S.C. § 541(a)(1)-(2).

[65] See Butner v. United States, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law").

property, acquired by either spouse during marriage.[66] A spouse's separate property is comprised of property owned or claimed by the spouse before marriage, property acquired by the spouse during marriage by gift, devise or descent, and the recovery for personal injuries sustained by the spouse during marriage (except any recovery for loss of earning capacity during marriage).[67] Thus, based upon Texas community property law, notwithstanding the disclosures executed to the contrary in obtaining the Dance Loan, the Tremont Property constituted the community property of the Jenkinses because the Tremont Property was acquired during the Jenkinses' marriage. Similarly, even though the Property Sale Contract with respect to the Tremont Property was executed by the Debtor alone, because the contractual rights thereunder were acquired during the Jenkinses' marriage, the contractual rights also constituted the community property of the Jenkinses.

That, then, leads to the question of whether these community property interests would have constituted property of the Debtor's estate but for their transfer in advance of the bankruptcy. Texas law provides that each spouse has the sole management, control and disposition of all community property that the spouse would have owned if single.[68] Accordingly, inasmuch as the Debtor obtained title to the Tremont Property in his name alone and he was the sole party to the Property Sale Contract with the Jenkins Children, both the Tremont Property and the contractual right to receive the Sales Price for conveyance of the Tremont Property constituted community property within the sole management, control and disposition of the Debtor because such interests would have constituted property of the Debtor, alone, if single. Thus, correspondingly, because the contractual right to receive $82,266.00 of the Sales Price would have constituted property of

---

[66] Tex. Fam. Code § 3.002.

[67] *See id.* § 3.001.

[68] *Id.* § 3.102(a).

the Debtor's bankruptcy estate but for the Gift of Equity,[69] then, contrary to the position taken by the Jenkins Children, the full amount of the Gift of Equity constituted "an interest of the debtor in property" for purposes of section 548 of the Bankruptcy Code.

### (b) Cash Transfer

Next, in the case of the Cash Transfer (which the Trustee asserts was comprised of $14,644.00 in closing costs paid by the Debtor), at trial the Jenkins Children called into question whether any amount of such Transfer constituted an interest of the Debtor in property.  In this regard, first the Jenkins Children highlighted the fact that the bulk of the Cash Transfer – being the Debtor's Closing Cash Payment of $12,135.08 – was made by a cashier's check acquired by Elizabeth, not the Debtor.[70]  Second, Tyler and Elizabeth testified to the Jenkins Children's contribution of $6,800.00 towards closing costs.  The Trustee, on the other hand, relied upon Allegiance's Receipts and Disbursements Ledger from the closing which reflected, among other things, the Debtor as payor of the Debtor's Closing Cash Payment.

On this matter, the Court was not persuaded by the content of the Allegiance Receipts and Disbursements Ledger inasmuch as the ledger appears to have simply referred to the party responsible for paying particular amounts as the "payor" as opposed to formally making a determination as to the source of such funds.  In all other respects, testimony regarding the source of funds for the payments was muddled, except for the uncontroverted testimony that the Jenkins Children contributed $6,800.00 towards the closing costs – an amount sufficient to fully satisfy the Jenkins Children's Closing Cash Payment and a portion of the Debtor's Closing Cash Payment.  Thus, the maximum amount of the alleged Cash Transfer that could have constituted an interest of

---

[69] *See* 11 U.S.C. § 541(a)(2)(A).

[70] *See* Trustee's Exh. 20(k) ($12,135.08 cashier's check reflecting Elizabeth as remitter).

the Debtor in property was $7,844.53 (a portion of the Debtor's Closing Cash Payment, which is discussed further below in connection with the analysis of reasonably equivalent value).

### (c) Mortgage Transfers

Finally, with respect to the Mortgage Transfers, the Trustee had the burden of establishing the amount of such transfers. The Trustee asserts that such transfers aggregated $24,608.08.[71] While the Jenkins Children admit that they made none of the Quicken mortgage payments through the date of the bankruptcy filing,[72] and while the Debtor scheduled regular monthly rental or home ownership expenses of $3,000.00 with respect to the Tremont Property,[73] the Trustee has failed to present evidence substantiating her calculation of the alleged amount of the Mortgage Transfers. Under the terms of the Quicken Note, $16,908.56 in mortgage payments came due through the Petition Date.[74] Therefore, the amount of Mortgage Transfers to be considered for avoidance is $16,908.56.

### 2. Exchange of Reasonably Equivalent Value

Next, the Jenkins Children challenge the Trustee's assertion of lack of reasonably equivalent value. With respect to the Gift of Equity and Cash Transfer, the Jenkins Children assert that "the protection of the Tremont Property from foreclosure and the ability of the Jenkins family to remain in their family home was [the] valuable consideration received in exchange."[75] With respect to the Mortgage Transfers, at trial the Jenkins Children argued that such payments were

---

[71] *See* PTO, at p. 3 (Trustee's statement of the case).

[72] *See* PTO, ¶ II.64.

[73] *See* Trustee's Exh. 1, at p. 24 (Schedule J, Part 2, Question 4).

[74] *See* Trustee's Exh. 20(e) (Quicken Note, providing for monthly payments of $2,113.57 beginning on November 1, 2016).

[75] *See* PTO, at p.4 (Jenkins Children's statement of the case).

reasonably equivalent value for the alleged tenancy at will granted by the Jenkins Children to the Debtor and his wife.

"'[R]easonably equivalent value' means that 'the debtor has received value that is substantially comparable to the worth of the transferred property.'"[76] In measuring the value of what has been received by the debtor, such value is to be judged from the standpoint of the debtor's creditors. "'The proper focus is on the net effect of the transfers on the debtor's estate, [and] the funds available to the unsecured creditors.'"[77]

Thus, in the case of the Gift of Equity, considered from the perspective of creditors, while transfer of the Tremont Property to the Jenkins Children enabled "the Jenkins family to remain in their family home," nothing of realizable, monetizable value by creditors was provided by the Jenkins Children in specific exchange for the Gift of Equity. The Gift of Equity was a gift. Accordingly, the Trustee has satisfied the burden of proving that the Debtor received less than reasonably equivalent value for the Gift of Equity.[78]

Turning next to the portion of the Cash Transfer that was not satisfied from the $6,800.00 contributed by the Jenkins Children – namely, $7,844.53 of the Debtor's Closing Cash Payment – the Trustee fails to take into account the fact that the Debtor's Closing Cash Payment was an obligation of the Debtor under the sales transaction. With that in mind, the Cash Transfer is not avoidable because the payment of amounts owed by the Debtor constituted reasonably equivalent value for the resulting reduction in the Debtor's Closing Cash Payment owed by the Debtor.[79]

---

[76] *Stanley v. U.S. Bank Nat'l Ass'n (In re TransTexas Gas Corp.)*, 597 F.3d 298, 306 (5th Cir. 2010) (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 548 (1994)).

[77] *TransTexas Gas Corp.*, 597 F.3d at 306 (quoting *In re Hinsley*, 201 F.3d 638, 644 (5th Cir. 2000)).

[78] *See, e.g., Orr v. Boldizar (In re Boldizar)*, Adversary No. 07-2785, 2009 WL 1025385 (Bankr. D.N.J. 2009) (finding less than reasonably equivalent value exchanged for debtors' gift to daughter of reduction in purchase price of property).

[79] *See Garner v. Sherwood (In re Jones)*, Adversary No. 18-04098, 2019 WL 1167812, at *8 (Bankr. N.D. Tex. 2019); *Walker v. Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010).

Finally, in the case of the Mortgage Payments, similar to the Gift of Equity, the Trustee appears to view them as pure gifts. However, here the Trustee fails to acknowledge the legal implications of the sale, and this is where the Jenkins Children's argument with respect to preservation of the family home has meaning. Specifically, inasmuch as the Jenkinses did not retain any interest in the Tremont Property as part of the sale – a point emphasized by the Trustee – the Debtor had no legal right to remain in the property after the sale. By making the Mortgage Payments, however, the Debtor not only obtained the Jenkins Children's permission to stay, but perhaps more significantly, kept the Quicken loan current, thereby preventing loss of the property. In other words, but for such payments to retain possession of the Tremont Property, the Debtor necessarily would have incurred the expense of renting or buying a new residence and then relocating. Consequently, the question is whether the right to continued possession and enjoyment of the Tremont Property constituted less than a reasonably equivalent value in exchange for the Mortgage Payments. On this question, the Trustee had the burden of proof, yet did not present any evidence to call into question the equivalence of the exchange. Consequently, in the case of the Mortgage Payments, the Court finds that the Trustee has failed to prove that the Debtor received less than reasonably equivalent value in exchange for such payments.

### 3.  *"No Harm, No Foul" Exemption Argument*

Next, the Jenkins Children argue that the Gift of Equity is unavoidable on account of the alleged exempt status of the Tremont Property. In this regard, predicated on the assertion that the Tremont Property was the exempt homestead of the Jenkinses at the time of the sale, the Jenkins Children assert that transfer of the property (and in conjunction therewith the Gift of Equity) was harmless to creditors because, in the absence of such transfer (and associated gift), creditors would not have been able to collect from the property due to its exempt status.

In response to this "no harm, no foul" theory, the Trustee raises two counter arguments: first, that the Tremont Property never became exempt homestead property; and, second, that even if exempt, the "no harm, no foul" theory has no place in bankruptcy.

In making these arguments, the parties continue to erroneously focus on transfer of the Tremont Property instead of transfer, by way of waiver/release, of the contractual right to receive sales proceeds in the amount of the Gift of Equity. Nevertheless, because the contractual right to payment is inextricably tied to the Tremont Property transfer, in the sense that the contractual right would not have arisen but for transfer of the Tremont Property, then the "no harm, no foul" theory advanced by the Jenkins Children is considered.

In Texas, homestead property is exempt from most types of creditor claims. Not only is it statutorily protected, it is also constitutionally protected under the Texas Constitution.[80] As described by the Fifth Circuit, "[h]omesteads are favorites of the law, and are liberally construed by Texas courts."[81]

Neither the Texas Constitution nor the Texas Property Code clearly defines what is meant by "homestead."[82] In the case law, however, it has generally been described as "the dwelling house constituting the family residence, together with the land on which it is situated and the appurtenances connected therewith."[83] Applying the characteristics noted above, courts have

---

[80] *See* Tex. Const. art. XVI, § 50; Tex. Prop. Code § 41.001(a).

[81] *Perry v. Dearing (In re Perry)*, 345 F.3d 303, 316 (5th Cir. 2013).

[82] *See Norris v. Thomas*, 215 S.W.3d 851, 853 (Tex. 2007) ("Neither the Texas Constitution nor the Property Code defines 'homestead' with specificity").

[83] *Resolution Trust Corp. v. Olivarez*, 29 F.3d 201, 204 (5th Cir. 1994) (quoting *Lifemark Corp. v. Merrit*, 655 S.W.2d 310, 314 (Tex. App. – Houston [14th Dist.] 1983, writ ref'd n.r.e.)); see also *Rock Island Plow Co. v. Alten*, 116 S.W. 1144, 1145 (Tex. 1909) (homestead property described as "embrac[ing] the family residence or home as well as a place of business of the head of the family"); Tex. Const. art. XVI, § 51 ("the homestead in a city, town or village shall be used for the purposes of a home, or as both an urban home and a place to exercise a calling or business, of the homestead claimant"); Tex. Prop. Code § 41.002 (referring to use of property as home or both a home and a place to exercise a calling or business).

required proof of the following by a claimant to establish a property's homestead status: (1) overt acts of homestead usage; and (2) the intention to claim the property as a homestead.[84]

With the foregoing in mind, the Trustee asserts that the Tremont Property never became homestead property because both the Debtor and Elizabeth disclaimed any right to claim the Tremont Property as their homestead in connection with obtaining the Dance Loan.[85] The Jenkins Children, on the other hand, assert that their parents' actions at all relevant times evidenced their true intention to claim the Tremont Property as their homestead.

While homestead disclaimers were unquestionably provided by the Jenkinses in connection with securing the Dance Loan, it is nevertheless questionable whether the disclaimers had any prospective effect outside of the Dance Loan. In this regard, while ostensibly the disclaimers would have supplied Dance with an estoppel-based argument had the Jenkinses ever attempted to prevent foreclosure of the property on homestead exemption grounds, there is no basis for the extension of such argument to other third parties, particularly given the prospective nature of the disclaimers and the "generous" construction of homestead laws given by Texas courts.[86]

Here, the unchallenged testimony of the Debtor and Elizabeth was that, following execution of the disclaimers, they moved into the Tremont Property in December 2015, and that from and after the date of their move-in until the date of the sale of the property to the Jenkins Children, the Jenkinses used the Tremont Property as their family residence and home, intending to claim the property as their sole homestead. Accordingly, the Court finds that, as of the Closing Date, the Tremont Property constituted the Jenkinses homestead.

---

[84] *See Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 159 (Tex. 2015); *see also Wallace v. Rogers (In re Rogers)*, 513 F.3d 212, 223 n.9 (5th Cir. 2008).

[85] *See* Trustee's Exhs. 15 (¶¶ 5-6) and 16.

[86] *Norris*, 215 S.W.3d at 853 ("We construe homestead laws generously") (citing *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987)).

Turning then to the "no harm, no foul" argument, the Jenkins Children principally rely upon the case of *Kapila v. Fornabaio (In re Fornabaio)*, 187 B.R. 780 (Bankr. S.D. Fla. 1995). In *Fornabaio*, the debtor quitclaimed his interest in homestead property to his non-debtor wife. He then filed for relief under chapter 7 of the Bankruptcy Code. Thereafter, the chapter 7 trustee sought to avoid the transfer as a fraudulent transfer under section 548 of the Bankruptcy Code.[87] Based upon the fact that, outside of bankruptcy, the transfer of homestead property is not avoidable under applicable Florida law, the court precluded the trustee's avoidance of the transfer in bankruptcy, reasoning that "[t]he Bankruptcy Code was not enacted to penalize debtors for filing for bankruptcy."[88]

The Trustee, on the other hand, principally relies upon the case of *Trujillo v. Grimmett (In re Trujillo)*, 215 B.R. 200 (9th Cir. B.A.P. 1997), *aff'd*, 166 F.3d 1218 (9th Cir. 1999). In *Trujillo*, much like the facts in this case, because the debtors were unable to obtain financing in their own names, they transferred their home to their daughter to obtain financing using her credit with the property serving as collateral. No consideration was given for the transfer and the debtors retained possession and control of the house after the transfer.[89] After the debtors' filing for chapter 7 relief, the trustee pursued avoidance of the transfer under section 548 of the Bankruptcy Code.[90] In affirming rejection of the "no harm, no foul" theory, the court reasoned that the theory is directly contradicted by the provisions of section 522(g) of the Bankruptcy Code.[91] Section 522(g) provides the opportunity for a debtor to claim, as exempt, property recovered on account of an

---

[87] *See Fornabaio*, 187 B.R. at 781.

[88] *Id*. at 782; *see also Malone v. Short (In re Short)*, 188 B.R. 857 (Bankr. M.D. Fla. 1995); *Jarboe v. Treiber (In re Treiber)*, 92 B.R. 930 (Bankr. N.D. Okla. 1988).

[89] *See Trujillo*, 215 B.R. at 202.

[90] *Id.*

[91] *See id*. at 205.

avoided transfer, provided, however, that the transfer was involuntarily made.[92] Thus, given the distinction between voluntary and involuntary transfers in section 522(g), the court reasoned that harm would, in fact, result in the absence of avoidance because the debtors would not be entitled to claim the avoided property as exempt in bankruptcy, making the property available for creditor recoveries.[93]

Similarly, this Court finds no basis for recognition of the "no harm, no foul" theory in bankruptcy. Initially, while state law fraudulent transfer statutes may set forth an exemption exclusion for otherwise avoidable transfers, such an exclusion has no application to claims pursued under sections 548 and 550 of the Bankruptcy Code. Had Congress intended for the same type of exclusion to apply in bankruptcy, it would have incorporated it into the Bankruptcy Code. It did not.[94] To the contrary, Congress expressly acknowledged the potential for the avoidance of otherwise exempt property in providing a debtor with the means under section 522(g) to claim the property as exempt post-avoidance, provided the transfer was not voluntarily made by the debtor. And just because one may find application of the plain wording of sections 548 and 550 to be penal in comparison to certain state law fraudulent transfer provisions does not provide a basis for the Court's exercise of legislative prerogative. The power to legislate is for Congress to exercise.[95] Accordingly, the Court finds that the Gift of Equity is not immune from avoidance and recovery under the "no harm, no foul" exemption theory.

---

[92] *See* 11 U.S.C. § 522(g)(1).

[93] *See Trujillo*, 215 B.R. at 205; *see also Tavenner v. Smoot*, 257 F.3d 401 (4th Cir. 2001), *cert. denied*, 534 U.S. 116 (2002); *Lasich v. Estate of Wickstrom (In re Wickstrom)*, 113 B.R. 339 (Bankr. W.D. Mich. 1990).

[94] *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there").

[95] *See Wells Fargo Bank of Tex. N.A. v. Sommers (In re Amco Ins.)*, 444 F.3d 690, 695 (5th Cir.) (explaining that the court's equitable power in bankruptcy does not permit the court to "act as a roving commission to do equity") (quoting *In re Southmark Corp.*, 49 F.3d 1111, 1116 (5th Cir. 1995)), *cert. denied*, 549 U.S. 973 (2006).

## B.     *Avoidance of the Transfers Under TUFTA*

The Trustee additionally and alternatively seeks avoidance of each of the Transfers under sections 24.005 and 24.006 of TUFTA.  Section 24.005 of TUFTA provides for the avoidance of both intentionally and constructively fraudulent transfers by a "creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made."[96]  Section 24.006 of TUFTA provides for the avoidance of a constructively fraudulent transfer by a "creditor whose claim arose before the transfer was made."[97]  With respect to both provisions, "creditor" is defined as "a person … who has a claim,"[98] and "claim" is defined as "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[99]  The Trustee has the burden of proving all elements of avoidance under TUFTA by a preponderance of the evidence.[100]

Among the elements necessary to establish a claim for avoidance under TUFTA is that the Trustee constitutes a "creditor."  Here, the Trustee has failed to establish that she was a creditor of the Debtor for purposes of avoidance under TUFTA.  While section 544(b) of the Bankruptcy Code enables a trustee to step into the shoes of a creditor in the bankruptcy case holding an allowable unsecured claim for the purpose of pursuing the avoidance of transfers that are avoidable under the above-referenced TUFTA provisions,[101] the Trustee has not pursued any relief in this

---

[96] Tex. Bus. & Com. Code § 24.005(a).

[97] *Id*. § 24.006(a).

[98] *Id*. § 24.002(4).

[99] *Id*. § 24.002(3).

[100] *See Galaz v. Galaz (In re Galaz)*, 850 F.3d 800, 804 (5th Cir. 2017).

[101] *See* 11 U.S.C. § 544(b)(1).

case under section 544(b) of the Bankruptcy Code. Therefore, the Trustee's direct claims under TUFTA will be denied.

## C.   Recovery of Value of Transfers Under 11 U.S.C. § 550

Pursuant to section 550 of the Bankruptcy Code, the Trustee seeks the recovery of the amount of each avoidable Transfer. Section 550 provides in relevant part that "to the extent that a transfer is avoided under section … 548 … of [the Bankruptcy Code], the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from … the initial transferee of such transfer or the entity for whose benefit such transfer was made…."[102]

The Jenkins Children were the initial transferees of the Gift of Equity and/or the entities[103] for whose benefit the Gift of Equity was made. And as previously indicated, the Gift of Entity is subject to avoidance under section 548 of the Bankruptcy Code. Therefore, the Trustee is entitled to relief under section 550 of the Bankruptcy Code. Because the property transferred was a contractual right to payment, the Court finds that the Trustee should be awarded the value of such contractual right – $82,266.00 – the amount of the contractual right to payment that was waived or released by virtue of the Gift of Equity.

## D.   Request for Partition and Sale Under Texas Property Code

Predicated on the assertion that the Trustee holds, or will hold, an interest in the Tremont Property on account of any of the Transfers that are avoided, the Trustee additionally requests a partition of the Tremont Property under section 23.001 of the Texas Property Code. The Jenkins Children claim that this Court does not have the jurisdictional authority to provide such relief,

---

[102] 11 U.S.C. § 550(a)(1).

[103] Under the Bankruptcy Code, the term "entity" includes a person, and a "person" includes an individual. *See* 11 U.S.C. §§ 101(15), 101(41).

which, according to the Jenkins Children, may only be exercised by a Texas district court located within the county where the Tremont Property is situated.

Section 23.001 of the Texas Property Code provides in relevant part that "[a] joint owner or claimant of real property or an interest in real property … may compel a partition of the interest or the property among the joint owners or claimants under [chapter 23 of the Texas Property Code] and the Texas Rules of Civil Procedure."[104]  Thus, as evidenced by the language of section 23.001, in order for partition relief to be available, the party seeking such relief must be a "joint owner or claimant" of the real property or an interest in the real property at issue.  In this case, the Trustee is not a joint owner or claimant of the Tremont Property or of any interest in the Tremont Property, and the Trustee will not become such a joint owner or claimant based upon avoidance of the Gift of Equity.  As previously indicated, the Gift of Equity, itself, did not constitute an interest in the Tremont Property; it constituted the waiver or release of the contractual right to receive $82,266.00 of the Sales Price.  Therefore, inasmuch as the Trustee has no basis to obtain partition relief under the Texas Property Code, it is unnecessary for the Court to consider the Jenkins Children's jurisdictional argument.  The partition claim will be denied.

**E.**     *Other Requested Relief*

Finally, the Trustee also requests pre- and post-judgment interest and an award of attorneys' fees and expenses.  In each case, the Trustee has the burden of establishing the basis for such relief.

With respect to prejudgment interest, there is no express reference to the right to receive such interest within the Bankruptcy Code.  In the context of avoided transfers, however, some courts have relied upon the word "value" in section 550(a) of the Bankruptcy Code as a source of

---

[104] Tex. Prop. Code § 23.001.

authority to provide such relief.[105]  Ultimately, most courts have simply found that "[t]he decision to allow prejudgment interest on an avoided … transfer is within the equitable discretion of the court."[106]  In exercising such discretion, however, at least one court has suggested that "prejudgment interest should be awarded unless there is a sound reason not to do so."[107]

In this case, no sound reason has been presented to not award prejudgment interest, and the award of prejudgment interest will provide for the recovery of the full value of the avoided Gift of Equity.  Accordingly, the Court will award prejudgment interest.

Where prejudgment interest is warranted, such interest "begins to accrue from the date of demand for the return of the transferred property, or in the absence of a demand, from the date of the commencement of the adversary action," and an appropriate rate of interest to apply is the federal post-judgment rate as of such date.[108]  Here, no evidence has been presented of an initial demand for recovery of the Gift of Equity; thus the Court will use November 30, 2017 – the date of the commencement of the adversary proceeding – as the date on which prejudgment interest began to accrue.  As of such date, the federal post-judgment interest rate was 1.62% per annum.  Therefore, the Trustee will be awarded prejudgment interest on the $82,266.00 awarded on account of the avoided Gift of Equity for the period November 30, 2017 through the date of judgment.

---

[105] *See, e.g., Hechinger Inv. Co. of Delaware, Inc. v. Universal Forest Prods., Inc. (In re Hechinger Inv. Co. of Delaware, Inc.)*, 489 F.3d 568, 579 (3rd Cir. 2007).

[106] *Southmark v. Schulte, Roth & Zabel*, LLP, 242 B.R. 330, 343 (N.D. Tex. 1999) (citing *Wilson v. First Nat'l (In re Missionary Baptist Found. of Am., Inc.)*, 69 B.R. 536, 538 (Bankr. N.D. Tex. 1987)), *aff'd in relevant part*, 239 F.3d 365 (5th Cir. 2000); *see also West v. Hsu (In re Advanced Modular Power Sys., Inc.)*, 413 B.R. 643, 684 (Bankr. S.D. Tex.), *aff'd*, 2009 WL 7760300 (S.D. Tex. Dec. 30, 2009).

[107] *In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir. 1997).

[108] *Southmark*, 242 B.R. at 343 (citing *Palmer v. Radio Corp. of Am.*, 453 F.2d 1133, 1140 (5th Cir. 1971)).

Turning next to post-judgment interest, while the award of such interest has similarly been described as within the discretion of the court,[109] section 1961 of title 28 provides for the allowance of such interest on "any money judgment in a civil case recovered in a district court" and establishes the rate of such interest.[110] Thus, because the award of post-judgment interest is both statutorily provided for and is an appropriate means to enable recovery in full of the judgment, post-judgment interest will be awarded to the Trustee in accordance with the provisions of section 1961 of title 28.

Finally, with respect to the Trustee's request for attorneys' fees and expenses, the "basic point of reference when considering the award of attorney's fees is the bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise."[111] With this bedrock principle in mind, neither section 548 nor section 550 of the Bankruptcy Code provides for the recovery of attorneys' fees and expenses in a fraudulent transfer case. And here, there is no contract between the Trustee and the Jenkins Children. Therefore, there is no basis on which to award attorneys' fees and expenses to the Trustee. Moreover, the Trustee has failed to present any evidence with respect to the amount of the attorneys' fees and expenses incurred. Therefore, Movant's request for an award of attorneys' fees and expenses will be denied.

### *CONCLUSION*

Based upon the foregoing, and in summary, the Court will separately issue a Final Judgment that provides for the following:

---

[109] *See Advanced Modular Power Sys., Inc*., 413 B.R. at 894 (citing *Williams v. Trader Pub. Co*., 218 F.3d 481, 488 (5th Cir. 2000)).

[110] *See* 28 U.S.C. § 1961(a)-(b).

[111] *Baker Botts LLP v. Asarco LLC*, 135 S.Ct. 2158, 2164 (2015).

1.      Avoidance of the Gift of Equity in the amount of $82,266.00 pursuant to 11 U.S.C. § 548(a)(1)(B);

2.      The award of the following amounts to the Trustee against the Jenkins Children, jointly and severally:

      (a)      $82,266.00 on account of the avoided Gift of Equity pursuant to 11 U.S.C. § 550(a);

      (b)      prejudgment interest on such amount at the rate of 1.62% per annum through the date of judgment;

      (c)      costs of court; and

      (d)      post-judgment interest on all amounts awarded at the applicable federal post-judgment rate of interest under 28 U.S.C. § 1961 until such amounts are paid in full;

      and

3.      The denial all other relief requested in the action with prejudice.

### # # #   END OF MEMORANDUM OPINION   # # #